FILED

2015 JUL -6 PM 1:2?

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Case No.: 8:15CV1571T17JSS

UNITED STATES OF AMERICA ex rel.,
PEGGY WATSON, M.D.

Plaintiff/Relator,

v.

COMPANION DX REFERENCE LAB, LLC
d/b/a/ COMPANION DX,

Defendant.
_______________________________/

**Filed Under Seal Pursuant to 31 U.S.C. § 3730(b)(2)**

**COMPLAINT PURSUANT TO THE FALSE CLAIMS ACT**
**(31 U.S.C. § 3730(b)(2))**

COMES NOW, UNITED STATES OF AMERICA ex rel. PEGGY WATSON (hereinafter "Plaintiff" or "Relator"), and hereby submits the following complaint under seal in accordance with the requirements of the False Claims Act, 31 U.S.C. §3730(b)(2) and further states as follows.

## I. INTRODUCTION AND SUMMARY OF ALLEGATIONS

1. This matter involves a widespread and ongoing fraud on the government perpetrated by Companion Dx Reference Lab, LLC, d/b/a Companion Dx (hereinafter "Defendant" or "Companion Dx"). Defendant developed a clinical study whereby it actively recruited participants in a fraudulent scheme to bill Medicare for genetic tests by falsifying medical necessity. Defendant has wilfully disregarded rules and regulations established by the Centers for Medicare and Medicaid Services (CMS) by deceiving physicians, and other medical providers as well as patients, to the true nature of the clinical study.

TBA-2020
$400



S-1

2. Defendant devised a system where its employees would meet with patients and certify them as 'clinical participants' in a large scale clinical trial prior to or in the absence of a medical necessity review by the patient's actual physician. Defendant would then utilize the electronic signature of a physician (without their knowledge) to indicate that the physician had certified medical necessity, when in fact, no such certification had been assessed by the physician. In the case of Relator's patients, no such medical necessity was obtained from Relator.

3. Defendant provided details to Relator and other physicians participating in the clinical study that stated the duration of the study would be for 39 months and that up to 279,000 patients would be tested in approximately 2,000 sites across the United States. Defendant lured Medicare patients and physicians to participate in the study by implying that patients would not be billed for the testing. For each patient participating in the clinical study physicians and other providers would be paid $76. Despite its representations to the contrary, Defendant fraudulently billed Medicare for services that were not medically necessary by falsifying documents and patient records.

## II. PARTIES

### A. Relator

4. Under the False Claims Act, a person with knowledge of false or fraudulent claims against the government (a "Relator") may bring an action on behalf of the government and himself.

5. Peggy Watson, M.D. is a resident of Tampa, Florida and practices in Land O'Lakes, Florida. Dr. Watson is employed by GMS Florida West Coast, Inc., a Physician Group Practice (hereinafter "GMS").

6. GMS is a primary physician group practice with 16 office locations in Hillsborough, Pasco and Pinellas County, Florida. Dr. Watson is employed at the Land O' Lakes

Primary Care Wellness Center along with Dr. Larnel P. Sultan. GMS is a physician owned practice and Dr. Watson maintains a small ownership stake in GMS.

7. Relator is an original source of information within the meaning of the federal False Claims Act, 31 U.S.C. §3730(e)(4)(B).

**B. Defendant**

8. Companion Dx Reference Lab, LLC, d/b/a Companion Dx has two main locations, one in Houston, Texas and the other in Honolulu, Hawaii. Companion Dx is a Limited Liability Corporation organized under the laws of the state of Texas. According to its website, Companion Dx is a high-complexity CLIA certified laboratory specializing in pharmacogenomics, cancer companion diagnostics, targeted NGS and epigenomic testing.

## III. JURISDICTION AND VENUE

9. Jurisdiction is proper in this Court because Relator seeks relief on behalf of the United States of America for violations of 31 U.S.C. §3729.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331, 1345, and supplemental jurisdiction to entertain common law or equitable claims pursuant to 28 U.S.C. §1367(a).

11. Relator has made voluntary disclosures to the government prior to the filing of this lawsuit as required by 31 U.S.C. §3730(b)(2)

12. This Court has personal jurisdiction over Defendant and venue is proper in the Middle District of Florida pursuant to 31 U.S.C. §3732(a) because Defendant transacts business in this District, and because many of the acts alleged herein to be in violation of 31 U.S.C. §3729 occurred in this District.

## IV. THE NATURE OF THE CASE

13. On December 9, 2014, Lindsay Alexander, a GMS employee within Relator's practice, sent an email to GMS site managers that outlined a clinical trial in which GMS providers could participate. Attached to the email was a letter prepared by Ms. Alexander that announced that Companion Dx had approached GMS about participating in a Medicare pharmacogenomics study. The letter explained that the "trial involves an analysis of the patient's genetics relative to their medications" and that this would result in a report back to participating physicians that would assist the physicians in maximizing "therapeutic drug management and prevent adverse or less than optimal drug therapy" for their patients. The letter outlined that participation was voluntary and that Companion Dx would pay GMS $76 for each patient enrolled in the study. The letter identified Ryan Ralls as the account executive who would coordinate meetings with GMS offices that wanted to participate in the clinical trial.

14. Relator and her office manager, Mary Stupia, met with Mr. Ralls on December 30, 2014, where they discussed the genetic testing that would be performed on Medicare patients and the benefits to Relator and her staff in treating patients. Mr. Ralls told them that the study was for Medicare patients now but in the future, private insurance would possibly be accepted as well. Mr. Ralls stated that the genetic testing would inform providers of the effects of a patient's unique genetic makeup on the medications prescribed to them. Mr. Ralls told Relator there would be minimal work and that each provider could earn extra income. Mr. Ralls stated both Medicare (often called straight Medicare) and Medicare Advantage plan participants would be involved in the study.

15. A few weeks later, in January 2015, Relator and her staff, which included Dr. Larnel Sultan, her three advanced registered nurse practitioners (ARNP), Lauren DeNeve, Whitney Cameron and Valerie Buethe and Relator's office manager, Mary Stupia, participated in

another meeting with Mr. Ralls who explained the clinical study and the benefits of genetic testing. Mr. Ralls stated that if Relator's office were enrolled in the study, Defendant would place a full or part time employee in GMS' office to assist with the patients in the study. Later, Relator would discover that these employees were called either site coordinators (SC) or research coordinators (RC) but was not notified that they had any credentials to be appropriate for patient contact or to be competently evaluating patient's medical records. Relator and her staff believed that they were participating in a Medicare sanctioned clinical trial as Mr. Ralls explained the two Medicare plans that could be used.

16. The clinical study was named the Utility of PharmacoGenomics for Reducing Adverse Drugs Effects, a/k/a UPGRADE. According to Defendant, UPGRADE was designed to determine if data from Pharmacogenomic[1] testing (PGx) could help physicians manage patient medication regimens and assess if the testing had an effect on reducing adverse drug reactions, hospitalizations and emergency room visits.

17. Defendant officially started UPGRADE in April 2014 and the estimated completion date is July 2017. UPGRADE was to recruit up to 279,000 participants. The eligibility criteria as described at ClinicalTrials.gov, provided that in order to participate, subjects were in part:

> *Subject plans to undergo current index PGx testing at the time of enrollment or underwent current index PGx testing within the prior 1-year period, for genes known to influence metabolism of at least one target drug;*
> *Subject is aged ≥18 years;*
> *Subject is able and willing to provide written informed consent;*
> *Subject reveals a history of at least one TDAE or an inadequate therapeutic effect from a target drug over the 12-month period preceding expected receipt of PGx test results; and*
> *Subject is not taking an investigational medication or in an interventional trial that would interfere with participation in the registry.*

[1] The study of how genes affect a person's response to drugs is known as Pharmacogenomics.

18. During the meeting with Relator's staff, Mr. Ralls explained initially that any patient on Medicare could participate in the clinical study. During the meeting, ARNP Cameron asked specifically if they were only to enroll patients who were experiencing difficulties with their medications, Mr. Ralls responded, "*no, just sign up everyone who walks through the door with Medicare.*" After Relator's office began participating in the study, Mr. Ralls clarified that only Medicare patients who were prescribed medication should be included in the clinical study.

19. Relator and her staff were required to provide Mr. Ralls with their electronic signatures. On February 11, 2015, Mr. Ralls emailed Relator the details of how the physicians would be paid in the study. The email explained that an honorarium of $76 would be paid for each patient signed up for the clinical study. The amount was broken down and paid in two separate transactions. The initial amount paid would be 25% of the $76 approximately one month after the sample had been received by Defendant and a report was submitted back to the provider. The remaining payment owed would be paid after the patient is finalized (patients are finalized after 90 days).

20. Relator explained that the study was limited to participants who have a history of at least one adverse drug-related event (TDAE) or have experienced an inadequate therapeutic response from a target drug. However, Relator was not aware of these specific inclusion criteria until after Relator ceased any involvement in the trial.

21. Between February 2015 and April 2015, Mr. Ralls provided several employees that would assist Relator and her staff in signing up patients for the UPGRADE clinical study. The employees were brought on in succession, with the next one starting when the prior employee was no longer working. Two of these employees were identified as Lisa Ignacio and Elna Jean-Pierre and the third was Dorka Last Name Unknown ("LNU").[2] Initially, Relator was led to

[2] Dorka LNU also worked at Dr. Mark Weissman's office.

believe that the employees were paid an hourly rate (approximately $15) but later determined that the employees were actually incentivized by the number of patients they signed up for the clinical study. Relator stated that the three employees would review the upcoming schedule of patients to be seen by Relator and Dr. Sultan, and on days when there were no Medicare patients scheduled, they would not come into the office.

22. When Medicare patients arrived for a regularly scheduled appointment, they would first be met by Ms. Ignacio, Ms. Pierre or Dorka LNU in a room outside the presence of any of Relator's employees. The patients were asked if they wanted to be part of the study and the benefits of participating in the study were explained to them. A single page script was used by Defendant's employees to assist in their efforts to sign up patients for the clinical study. The script stated:

> *Dr ______ is doing a study on genetic testing. The study will give the Dr Insight as to how you metabolize drugs. The study is free for you, and just requires a que tip swab. Would you like to help Dr. ______ out with his study.*

23. Defendant developed a form to record the information needed from each participant in the study named the *DNA Drug Sensitivity Test.* Defendant's employees would only spend a few minutes with each patient and if the patient wanted to participate, they would get the patient to read and sign the *patient statement of consent and release*. Once the form was completed, Defendant's employees would perform a buccal swab that would be submitted to Defendant's laboratory located in Houston, Texas. After the buccal swab was completed, the patient would then await the arrival of their provider for their scheduled appointment.

24. After obtaining the patient's consent and performing the buccal swab, Defendant's employees would access the patient medical records who were participating in the clinical trial. This access to the medical record was provided by GMS, Relator's employer. They would record certain information onto the DNA Drug Sensitivity Test form straight from the patient's medical

record that included the patients ICD-9 diagnostic codes, medications, allergies and medical history.[3]

25. Relator and Dr. Sultan began seeing patients who had been admitted into the clinical study on approximately February 2, 2015. They stopped participating in the study on or about April 10, 2015. During this period of time, Relator stated that approximately 120 Medicare patients had been signed up for the clinical study.

26. On April 9, 2015 Relator was presented with a stack of letters by her office manager Mary Stupia and was told that Mr. Ralls needed Relator to sign them. These letters were penned by Defendant but were made to look as if they were written by Relator. When Relator questioned what it was that she was being asked to sign, she was told that they were letters of medical necessity to support the testing.

27. Without medical necessity, Medicare would not reimburse Defendant laboratory for services performed. Relator did not think at that time that Medicare would be paying for these tests and that the costs were being born as part of the costs of a study protocol, as is often the case. Relator began to realize that she was not participating in a legitimate clinical study as she had thought.

28. Relator and her office manager immediately began questioning involved parties on Thursday April 9, 2015, the day the letters of medical necessity were set in front of Relator. It was ascertained that Defendant's employees were using Defendant's issued electronic devices to garner patient consent and check off inclusion criteria for the study, followed by electronically signing the Relator's name, all without the patient ever having discussed the study with the Relator or Relator having certified that the patient met inclusion criteria.

---

[3] The International Classification of Diseases, 9th edition, Clinical Modification is a set of codes used by physicians, hospitals, and health workers to indicate diagnosis for all patient encounters. It is commonly referred to as ICD-9 codes or ICD-9-CM.

29. Defendant's employees were documenting the patient's medical history. Relator determined that Defendant's employees were electronically signing the Relator's name that was then transferred to the DNA Drug Sensitivity Test form. Through this scheme, it was made to appear that Relator was certifying the DNA test as medically necessary. Defendant was using Relator's electronic signature on all of the DNA Drug Sensitivity Test forms that were then used by Defendant to bill Medicare.

30. Defendant's employees used a checklist for sample shipment when signing up patients for the clinical study. Attached to the checklist was a reference guide that provided specific guidance to Defendant's employees on capturing the signature of providers. It stated, in part:

> **Saving physician signatures**
> *The Dr (s) signatures must be captured in the FEA site and your representative will help you do this. It only needs to be completed 1x for each provider ordering the test and the site saves it...*

31. Relator (along with Dr. Sultan and her ARNPs) provided her electronic signature at the beginning of her office's participation in the clinical study. Defendant utilized Relator's signature without her knowledge or consent to certify to Medicare that she had indeed deemed that the ordered genetic tests were medically necessary and determined that the genetic testing that Defendant wanted accomplished had been medically necessary.

32. Relator's concern about the clinical study increased when she questioned how the billing was being handled by Defendant. Relator's office manager contacted Mr. Ralls about who was paying for the buccal swabs genetic testing. In response, Mr. Ralls told Relator and her office manager Mary Stupia that Medicare was paying for the genetic testing and that the patient was not being billed.

33. Relator questioned several of her patients about the Medicare summary billing they had received and determined that in some cases, Medicare paid for the majority of the testing

but that in others, Medicare was denying payment and the Medicare summary reflected that the patient could be responsible for that portion of the bill. Relator was not aware of any patient who had received or paid a bill from Defendant for the testing.

34. By way of example, the following redacted patient information related to fraudulent billing by Defendant. This is but one small sample of the larger scheme perpetrated by Defendant:

**Medicare patient bearing claim number 229581557A**

35. On February 18, 2015, the patient was screened for and consented to be part of Defendant's clinical study. Defendant's employee filled out the DNA Drug Sensitivity Test form that contained the patient's medical history, medications, allergies and ICD-9 codes. The patient signed the form and in the lower half of the form, it appeared as if Dr. Sultan has electronically signed the form attesting to the medical necessity of the genetic testing. Dr. Sultan was not aware that his signature had been electronically added to the form. On or about April 1, 2015, Medicare provided a Medicare Summary Notice (commonly referred to as an EOB or explanation of benefits form) indicating that Medicare had paid $924.23 and that the maximum that the patient could be billed by Defendant was $1,379.91.

36. Relator and Dr. Sultan's electronic signatures were utilized by Defendant to fraudulently certify that the genetic testing was medically necessary to treat the medical condition that was described in Defendant's DNA Drug Sensitivity Test form. These certifications were used as a basis to fraudulently bill Medicare.

37. The below chart depicts a sample of DNA Drug Sensitivity Test forms which were fraudulently prepared by Defendant and used to bill Medicare fraudulently for reimbursement (note: asterisk denotes a Medicare Advantage plan):

| Date of Service | Claim and/or Policy Number |
|---|---|
| 2/9/2015 | 94473653800* |
| 2/10/2015 | 151328478A |
| 2/10/2015 | 199382878A |
| 2/10/2015 | 85313038800 |
| 2/12/2015 | 481504492A |
| 2/16/2015 | 417504673A |
| 2/18/2015 | 17324072A |
| 2/18/2015 | 17324072A |
| 2/18/2015 | 579564194A |
| 2/18/2015 | 058304774A |
| 2/19/2015 | 9790308840* |
| 2/19/2015 | 929937541* |
| 2/19/2015 | 252863580T |
| 2/20/2015 | 91434389000* |
| 2/23/2015 | 343361071A |
| 2/23/2015 | 227729088A |
| 2/23/2015 | 45283944A |
| 2/23/2015 | 923678669* |
| 2/23/2015 | 391465615A |
| 2/23/2015 | 440427622A |

38. A laboratory testing that was being considered by a provider first needs to be entered into the laboratory data base in GMS' office. If a particular laboratory test was queried and an incorrect ICD-9 code was entered, the query would result in a possible denial of services by Medicare. If this occurred, the patient would have to be provided an Advanced Beneficiary Notice of Non-coverage (ABN) form. The ABN is a written notice given to patients receiving certain items of service that is notifying the patient that Medicare may deny payment for a specific procedure or treatment. If denied by Medicare, the patient would be responsible for payment.

39. There were no ABNs being provided to Relator's patients by Defendant or the employees it utilized to enroll the patients. If the patient is not presented an ABN, then they can't be billed by the provider for the portion of the bill that Medicare would not pay.

40. In early March 2015, Mr. Ralls contacted Relator's office and stated that for a brief period of time, Relator's office could not accept Medicare, only Medicare Advantage plans. Mr. Ralls explained that Medicare was conducting an audit of some of the billings. Approximately three weeks later, Mr. Ralls told an employee of Relator's office that the audit had been completed and they could again accept Medicare patients.

41. Relator, in discussions with her office manager, was told that as a result of the audit, Medicare now required that two specific questions be asked of every patient who was being considered for the clinical study:

1) *Is the patient experiencing inadequate therapeutic results from their current medication regimen; or*

2) *Is the patient experiencing or has Adverse Drug Reactions (ADR) from their current medication regimen.*

42. Relator and her office manager Mary Stupia determined that Defendant's employees were asking Medicare patients the questions listed above since the end of the Medicare audit, which ended on approximately March 15, 2015. If the patient responded "no" to the second question concerning the patient having an adverse drug reaction, Defendant's employees would automatically select the other option. Relator stated that only medical professionals would have the medical training to adequately address these questions from a patient and then determine if they met medically necessity for genetic testing. In this way, regardless of actual patient responses, the form could be used to support testing.

43. On April 9, 2015, a few weeks after the Medicare audit, Relator received a stack of letters from Defendant with an attached medical necessity addendum that was to be completed by Relator for nine patients. Relator stated that her office partner, Dr. Sultan, received seven letters with attachments. Defendant's letter stated that Medicare was requesting a separate letter of medical necessity in order to finalize the billing process. The addendum listed the Relator's name

and office and included specific patient data including medications, ICD-9 codes and a brief medical history. Relator refused to sign the addendum because she could not certify that the patient had met medical necessity for the genetic testing. Relator assumed that the Medicare audit resulted in questions about the medical necessity for certain patients and if Medicare should reimburse Defendant for these services.

44. Mr. Ralls was extremely upset that Relator would not sign the medical necessity addendums. At one point, Mr. Ralls even threatened that he would begin to bill the patients if Relator did not sign the letters. Relator did not sign the letter and instructed her staff that her office would no longer be participating in the clinical study.

45. After Relator and her office stopped participating in the clinical study, she found a PowerPoint presentation that was created for Defendant by Syntactx, a New York based contract research organization. On page 5 of the PowerPoint Drug-Related Adverse Events are addressed. In Defendant's clinical study, this is also known as target drug-related adverse event (TDAE). The slide contains the following:

> *Appreciably harmful or unpleasant reaction, resulting from an intervention related to the use of a medication, which predicts hazard from future administration and warrants prevention or specific treatment, or alteration of the dosage regime or withdrawal of the product.*

## V. DAMAGES TO THE GOVERNMENT

46. Approximately 120 patients had been tested by Defendant until Relator's office ceased participating in the clinical study. Based on a review of Medicare Summary Notices forms reviewed by Relator, the average charge to Medicare for Defendant's DNA testing as part of UPGRADE averaged approximately $2,800 per patient.

47. None of the patients that were admitted into the study met medical necessity and therefore Medicare should not have been billed. Based solely on Relator's office, the losses to Medicare for the 120 patients would be approximately $336,000. It is estimated that two other

multi-physician offices employed by GMS saw an equal or greater number of patients as part of the clinical study. Relator estimated that upwards to 500 patients had been certified by Defendant's employees working at GMS office locations. The potential losses to Medicare would be nearly $1.4 million. As this fraudulent scheme appears to be widespread (Defendant stated 279,000 participants would be recruited) and assuming the average in each of the 2,000 offices is the same, Relator estimates that the damages to the government could be in the hundreds of millions.

## VI. THE FALSE CLAIMS ACTS

48. The FCA, as amended, provides in pertinent part that:

> [A]ny person who (A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval; (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; ... or (G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government, is liable to the United States Government for a civil penalty of not less than $5,500 and not more than $11,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990…plus 3 times the amount of damages which the Government sustains because of the act of that person. 31 U.S.C. § 3729(a)(1).

49. The terms "knowing" and "knowingly" in the FCA provision above "mean that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required. 31 U.S.C. § 3729(b)(1)(B).

## VII. COST REPORTING AND CLAIMS PROCESSING UNDER MEDICARE

50. In 1965, Congress enacted the Health Insurance for the Aged and Disabled Act, 42 U.S.C. § 1395, et seq., known as the Medicare Program, as part of Title XVIII of the Social

Security Act, to pay for the costs of certain health care services. Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. See 42 U.S.C. §§ 426, 426-1.

51. Reimbursement for Medicare claims is made by the United States through the Centers for Medicare and Medicaid Services ("CMS"), which is an agency of the Department of Health and Human Services ("HHS") and is directly responsible for the administration of the Medicare Program.

52. CMS contracts with private companies, referred to as "fiscal intermediaries," to administer and pay claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the fiscal intermediaries act on behalf of CMS. 42 C.F.R. § 413.64. Under their contracts with CMS, fiscal intermediaries review, approve, and pay Medicare bills, called "claims," received from medical providers. Those claims are paid with federal funds.

53. There are two primary components to the Medicare Program, Part A and Part B. Medicare Part A authorizes payment for institutional care, including hospitals, skilled nursing facilities, and home health care. 42 U.S.C. § 1395c-1395i-5. Medicare Part B is a federally subsidized, voluntary insurance program that covers a percentage of the fee schedule for physician services as well as a variety of medical and other services to treat medical conditions or prevent them. 42 U.S.C. §§ 1395j-1395w-5. The allegations herein involve Medicare Part B only for services billed by the Defendant to Medicare.

54. In order to get paid from Medicare, providers, like Defendant herein, complete and submit a claim for payment on a designated Health Insurance Claim Form, which, during the relevant time period, was or has been designated CMS 1500. This form contains patient-specific information including the diagnosis and types of services that are assigned or provided to the Medicare patient. The Medicare Program relies upon the accuracy and truthfulness of the CMS 1500 to determine whether and what amounts the provider is owed.

55. To this end, the Health Insurance Claim Form, CMS 1500, contains the following certification by the physician or supplier submitting a claim to Medicare:

> I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

56. That certification is then followed by the following "Notice:"

> Anyone who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

## VIII. MEDICARE ADVANTAGE

57. The Balanced Budget Act of 1997 (BBA) established a new Part C of the Medicare program, known then as the Medicare and Choice (M+C) program, effective January 1999. As part of the M+C program, the BBA authorized CMS to contract with public or private organizations to offer a variety of health plan options for beneficiaries, including coordinated care plans (such as health maintenance organizations (HMOs), provider sponsored associations (PSOs), and preferred provider organizations (PPOs)), Medicare Medical Savings Account (MSA) plans, private-fee-for-service (PFFS) plans, and Religious Fraternal Benefit (RFB) plans. These health plans provide all Medicare Parts A and B benefits, and most offer additional benefits beyond those covered under the Original Medicare program.

58. The M+C program in Part C of Medicare was renamed the Medicare Advantage (MA) Program under the Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA), which was enacted in December 2003. The MMA updated and improved the choice of plans for beneficiaries under Part C, and changed the way benefits are established and payments are made. Under the MMA, beneficiaries may choose from additional plan options, including regional PPO (RPPO) plans and special needs plans (SNPs). The MMA further

established the Medicare prescription drug benefit (Part D) program, and amended the Part C program to allow (and, for organizations offering coordinated care plans, require) most MA plans to offer prescription drug coverage.

59. Other Medicare health plans include section 1876 cost contract plans and section 1833 health care prepayment plans (HCPP plans). Cost contract plans are paid based on the reasonable costs incurred by delivering Medicare-covered services to plan members. Enrollees in these plans may use the cost plan's network of providers or receive their health care services through Original Medicare. Section 1833 HCPPs are generally employer-or union-sponsored managed care plans that provide for Medicare Part B benefits on a prepayment basis. Medicare reimburses HCPP plans for Part B services only and, like section 1876 cost plans, payment is based on reasonable costs.

## IX. CONDITIONS OF PARTICIPATION AND CONDITIONS OF PAYMENT

60. To participate in the Medicare Program, a health care provider must also file a provider agreement with the Secretary of HHS. 42 U.S.C. § 1395cc. The provider agreement requires compliance with certain requirements that the Secretary deems necessary for participating in the Medicare Program and for receiving reimbursement from Medicare.

### A. Medical Necessity and Appropriateness Requirements

61. One such important requirement for participating in the Medicare Program is that for all claims submitted to Medicare, claims may be submitted only when medical goods and services are (1) shown to be medically necessary, and (2) are supported by necessary and accurate information. 42 U.S.C. § 1395y(a)(1)(A),(B); 42 C.F.R., Part 483, Subpart B; 42 C.F.R. § 489.20.

62. Various claims forms, including but not limited to the Health Insurance Claim Form, require that the provider certify that the medical care or services rendered were medically

"required," medically indicated and necessary and that the provider is in compliance with all applicable Medicare laws and regulations. 42 U.S.C. § 1395n(a)(2); 42 U.S.C. § 1320c-5(a); 42 C.F.R §§ 411.400, 411.406. Providers must also certify that the information submitted is correct and supported by documentation and treatment records. Id.; see also, 42 U.S.C. § 1320c-5(a); 42 C.F.R. § 424.24.

63. The practice of billing goods or services to Medicare and other federal health care programs that are not medically necessary is known as "overutilization."

**B. Obligation to Refund Overpayments**

64. As another condition to participation in the Medicare Program, providers are affirmatively required to disclose to their fiscal intermediaries any inaccuracies of which they become aware in their claims for Medicare reimbursement (including in their cost reports). 42 C.F.R. §§ 401.601(d)(iii), 411.353(d); 42 C.F.R. Part 405, Subpart C. See also 42 C.F.R. §§ 489.40, 489.31. In fact, under 42 U.S.C. § 1320a-7b(a)(3), providers have a clear, statutorily-created duty to disclose any known overpayments or billing errors to the Medicare carrier, and the failure to do so is a felony. Providers' contracts with CMS carriers or fiscal intermediaries also require providers to refund overpayments. 42 U.S.C. § 1395u; 42 C.F.R. § 489.20(g).

65. Accordingly, if CMS pays a claim for medical goods or services that were not medically necessary, a refund is due and a debt is created in favor of CMS. 42 U.S.C. § 1395u(l)(3). In such cases, the overpayment is subject to recoupment. 42 U.S.C. § 1395gg. CMS is entitled to collect interest on overpayments. 42 U.S.C. § 1395l(j).

**X. Other Federally-Funded Health Care Programs**

66. Although false claims to Medicare and Medicare Advantage are the primary FCA violations at issue in this case, the medically unnecessary testing that are the subject of this action may have been done on beneficiaries of one of two other federally-funded health care benefit

programs; Medicaid, or TRICARE. Accordingly, those other two programs are briefly discussed as well.

67. The Medicaid Program, as enacted under Title XIX of the Social Security Act of 1965, 42 U.S.C. § 1396, et seq., is a system of medical assistance for indigent individuals. CMS administers Medicaid on the federal level while the individual states administer the program on the state level. Reimbursement of hospital costs or charges is governed by Part A of Medicare, through the hospital cost report system, and reimbursement of physician charges is governed by Part B of Medicare. As with the Medicare Program, hospitals and physicians may, through the submission of cost reports and health insurance claim forms, recover costs and charges arising out of the provision of appropriate and necessary care to Medicaid beneficiaries.

68. TRICARE is a federal program, established by 10 U.S.C. §§ 1071-1110, that provides health care benefits to eligible beneficiaries, which include, among others, active duty service members, retired service members, and their dependents. Although TRICARE is administered by the Secretary of Defense, the regulatory authority establishing the TRICARE program provides reimbursement to individual health care providers applying the same reimbursement requirements and coding parameters that the Medicare program applies. 10 U.S.C. §§ 1079(j)(2) (institutional providers), (h)(1) (individual health care professionals) (citing 42 U.S.C. § 1395, et seq.). Like Medicare and Medicaid, TRICARE will pay only for "medically necessary services and supplies required in the diagnosis and treatment of illness or injury." 32 C.F.R. § 199.4(a)(1)(i). And, like the Medicare Program and the Medicaid Program, TRICARE prohibits practices such as submitting claims for services that are not medically necessary, consistently furnishing medical services that do not meet accepted standards of care, and failing to maintain adequate medical records. 32 C.F.R. §§ 199.9(b)(3)-(b)(5).

## VII. CLAIMS FOR RELIEF

**COUNT ONE**
**Violations of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(2)(A)**
**Presenting or Causing to be Presented False Claims**

69. Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

70. This is a qui tam action brought by Relator and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. §3730, for Defendant's violations of 31 U.S.C. § 3729 et seq.

71. The Federal False Claims Act, 31 U.S.C. § 3729(a)(2)(A) provides liability for "[a]ny person who--knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval."

72. By virtue of the above-described acts, among others, Defendant knowingly presented or caused to be presented false or fraudulent claims for payment or approval, and continues to cause to be submitted false or fraudulent claims for payment or approval, directly or indirectly, to officers, employees or agents of the United States, in violation of 31 U.S.C. § 3729(a)(2)(A).

73. Those false claims include claims for reimbursement for Defendant's laboratory test known as Companion Dx which would not have been submitted, and thereafter paid by the United States, but for the illegal practices of Defendant described in this Complaint.

74. Plaintiff United States, unaware of the falsity of the claims that the Defendant caused doctors, hospitals and other health care providers to make to the United States, and in reliance on the accuracy thereof, paid said doctors, hospitals, and other health care providers for claims that would otherwise not have been allowed. These claims - for payment for the

Defendant's Companion Dx test - were false as that term is defined by the Federal False Claims Act in that they were ineligible for reimbursement as described herein.

75. For those claims that Defendant submitted or caused to be submitted, it was foreseeable and in fact the intended result that those claims would be submitted. Further, at all times relevant to the Complaint, Defendant acted with the requisite scienter.

76. By reason of Defendant's unlawful practices, substantial numbers of doctors, hospitals, and other health care providers in the United States have been induced to order, or fooled into ordering substantial quantities of Defendant's test and these practices thus provided substantial unlawful profits to Defendant.

77. By reason of these unlawful practices by Defendant, as aforesaid, doctors, hospitals, and other health care providers have been induced to purchase Defendant's test rather than recommending less expensive drugs, procedures or treatment options for their patients.

78. The amounts of the false or fraudulent claims to the United States were material. United States, being unaware of the falsity of the claims and/or statements caused to be made by Defendant, and in reliance on the accuracy thereof, paid and continues to pay for Defendant's unlawfully induced purchase of the Companion Dx test.

79. It is believed that as a result of Defendant's violations of 31 U.S.C. § 3729 (a)(1)(A), the United States has suffered substantial losses in an amount that exceeds tens of millions of dollars, and is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false claim presented or caused to be presented by Defendant.

80. Relator is a private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Federal False Claims Act on behalf of herself and the United States.

## COUNT TWO

**Violations of the Federal False Claims Act**
**31 U.S.C. § 3729(a)(2)(B)**
**Creation or Use of False Statements or Records Material to a False Claim**

81. Relator repeats and incorporates by reference the allegations contained in Paragraphs 1 through 68 of this Complaint as if fully set forth herein.

82. This is a qui tam action brought by Relator and the United States to recover treble damages, civil penalties and the cost of this action, under the Federal False Claims Act, 31 U.S.C. § 3730, for Defendant's violations of 31 U.S.C. § 3729 et seq.

83. The Federal False Claims Act, 31 U.S.C. § 3729(a)(2)(B) provides liability for "[a]ny person who--knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."

84. By virtue of the above-described acts, among others, Defendant knowingly made or used or caused to be made or used false records or statements material to false claims, and continues to do so, in violation of 31 U.S.C. § 3729(a)(2)(B).

85. Tens of thousands of claims for reimbursement for Defendant's Companion Dx test would not have been submitted, and thereafter paid by the United States, but for the illegal practices of Defendant described in this Complaint including the creation and use of false statements or records by Defendant. The false statements include the electronic signature, DNA Drug Sensitivity Test forms and other records related to the above described scheme.

86. Plaintiff United States, unaware of the falsity of the records and/or statements which the Defendant made or caused doctors, hospitals and other health care providers to make that were material to false claims, and in reliance on the accuracy thereof, paid Defendant for claims that would otherwise not have been allowed. These claims - reimbursement claims for

Defendant's Companion Dx test - were false as that term is defined by the Federal False Claims Act in that they were ineligible for reimbursement as described herein.

87. For those records and/or statements that Defendant made or used or caused to be made or used, it was foreseeable and in fact the intended result that those statements and/or records would result in the payment of false reimbursement claims for Defendant's Companion Dx test. At all times relevant hereto, Defendant acted with the requisite scienter.

88. By reason of Defendant's unlawful practices, as aforesaid, substantial numbers of doctors, hospitals, and other health care providers in the United States have been induced to prescribe or order Defendant's Companion Dx test and thus provided substantial unlawful profits to Defendant. Moreover these purchases of Defendant's GeneSightRx test occurred instead of purchases of less expensive drugs, procedures or treatment options for patients.

89. The amounts of the false or fraudulent claims caused to be paid pursuant to Defendant's false records and statements made or used or caused to be made or used to the United States were material. Relator United States, being unaware of the falsity of the records and/or statements made or caused to be made by Defendant, and in reliance on the accuracy thereof, paid claims that Defendant knew to be false, as it intended.

90. It is believed that as a result of Defendant's violations of 31 U.S.C. § 3729 (a)(1)(B), the United States has suffered substantial losses in an amount that exceeds tens of millions of dollars, and therefore is entitled to treble damages under the False Claims Act, to be determined at trial, plus a civil penalty of $5,500 to $11,000 for each such false record and/or statement made or used or caused to be made or used by Defendant.

91. Relator is private person with direct and independent knowledge of the allegations of this Complaint, who has brought this action pursuant to the Federal False Claims Act on behalf of himself and the United States.

## X. DEMANDS FOR RELIEF

**WHEREFORE**, Relator, on behalf of the United States Government and the Plaintiff States, demands judgment against the above-named Defendant as follows:

a. Pursuant to 31 U.S.C. § 3729(a), Defendant pay an amount equal to three times the amount of damages the United States Government has sustained because of Defendant's conduct, plus a civil penalty of not less than $5,500 and not more than $11,000 or such other penalty as the law may permit and/or require for each violation of 31 U.S.C. § 3729, *et seq*;

b. Relator be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3729(d) of the False Claims Act and/or any other applicable provision of law;

c. Relator be awarded all costs and expenses of this action, including attorneys' fees as provided by 31 U.S.C. § 3729(d) and any other applicable provision of the law; and

d. Relator be awarded such other and further relief as the Court may deem to be just and proper.

Dated this 2nd day of July, 2015.

Respectfully submitted,

BY:____________________________

John Yanchunis (FBN 324681)
jyanchunis@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
201 North Franklin Street, 7th Floor
Tampa, Florida 33602
(813) 318-5169 Telephone
(813) 222-4793 Facsimile

James D. Young (FBN 567507)
jyoung@forthepeople.com
MORGAN & MORGAN
COMPLEX LITIGATION GROUP
76 S. Laura St., Suite 1100
Jacksonville, FL 32202
(904)361-0012 Telephone
(904)366-7677 Facsimile

*Attorneys for Plaintiff/Relator*